*Noel v. Owen*, 418-7-17 Wncv (Teachout, J., Apr. 9, 2018).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                        **CIVIL DIVISION**
**Washington Unit**                                       **Docket No. 418-7-17 Wncv**

**ANDRE NOEL and EURO-DEC, INC.**
      **Plaintiffs**

      **v.**

**ROSEMARY ANN OWEN**
      **Defendant**

### DECISION
### Ms. Owen's Motion to Dismiss

Plaintiff Andre Noel and Defendant Rosemary Ann Owen were divorced in Vermont in 2015 after 35 years of marriage.[1]  The final order of divorce, which was affirmed on appeal, awarded the Waterbury residence to Ms. Owen and Mr. Noel's various businesses to him, including Euro-Dec, Inc., a plaintiff in this case.  After the divorce, Mr. Noel filed this action against Ms. Owen, claiming that she is liable to him personally for hundreds of thousands of dollars "advanced" to her over the course of the marriage and to him or Euro-Dec for two $47,500 bank checks she purportedly converted from Euro-Dec in 1995.  Ms. Owen has filed a Rule 12(b)(1) motion seeking dismissal.  She argues that this case is an impermissible collateral attack on the final order of divorce.  Mr. Noel has not indicated opposition to dismissal as far as the claim for "advances" goes, but he asserts that the allegedly fraudulent bank checks were not litigated in the divorce proceeding and thus may be litigated here.  The court concludes that it lacks subject matter jurisdiction over this case because it is a collateral attack on the final order of divorce.

The family division found as follows.  The parties were married in 1979, at which time they had executed a pre-nuptial agreement under Quebec law.  They "understood this meant the spouses' individually-owned property would always remain individually-owned, that each party would be responsible for his and her own debt; and each party would be entitled to receipt of his and her own separate property upon dissolution of the marriage."  Final Order 2.  In 1990, in response to a change in Quebec law, they confirmed their desire to be bound by the pre-nuptial agreement.

By the time of divorce, it was clear that the Waterbury residence had been bought by Ms. Owen and had always remained titled to her alone.  Mr. Noel's several businesses had ended up owned exclusively by him, although Ms. Owen had interests in them at various times.  The court found the value of the Waterbury residence to exceed $400,000.  It did not attempt to value Mr. Noel's businesses.  At the hearing, "Husband would not say whether the business assets were worth more than $100,000 or less.  In declining to answer this question on cross-examination, Husband did not claim a lack of memory or understanding.  He made it clear he was simply

---

[1] Mr. Noel and Ms. Owen now are residents of Canada and England, respectively.

declining to answer the question." Final Order 7–8.

Otherwise, despite their nuptial agreements, throughout their marriage the parties did little to keep their separately owned property separate. They commingled their own personal resources, and they extensively commingled their personal and business resources. "[A]s a practical matter the funds from the Husband's business operations and the funds for parties' living expenses were habitually intermingled, as was their business and personal debt. The Court finds this latter contention is amply supported by the evidence." Final Order 3. They also attempted to shield assets from the risk of loss due to a lawsuit by gratuitously placing them in Ms. Owen's name. *Id.* Even when Mr. Noel's businesses were generating $1,000,000 in annual revenues, he drew a nominal salary of $10,000, though his lifestyle far exceeded that. They took out a series of mortgage and home equity loans secured by the residence. "[T]he vast majority of the monies borrowed against the house went to meet Husband's business operations." *Id.* at 4. Ms. Owen received promissory notes from the businesses in return for some portion of those amounts. They were later "written off," and Ms. Owen's shares extinguished, when the businesses went bankrupt. Mr. Noel became the sole shareholder when they were reorganized.

The family court's findings continue in that manner. However, it had before it Mr. Noel's claims that in the course of the marriage he had "advanced" hundreds of thousands of dollars to Ms. Owen, and that she somehow wrongfully acquired two $47,500 cashier checks from Euro-Dec accounts. In a footnote, the court explained that Mr. Noel asserted that the company issued two such checks to her. "Husband could not recall what these payments were for and suggested Wife had somehow authorized them without his knowledge. Who authorized these payments and whether these payments represented partial repayment of the promissory notes remains unclear." Final Order 5 n.1.[2]

In the end, the court never attempted to untangle the parties' personal and business finances. Instead, it relied on their nuptial agreements to the following effect. By the time of divorce, there was some equity in the Waterbury residence and otherwise Ms. Owen was in substantial debt. The value of Mr. Noel's businesses was unknown because he refused to testify about that. Otherwise, he had no substantial resources. The court awarded the Waterbury residence to Ms. Owen, and the businesses to Mr. Noel, and each party remained responsible for personal debts and was awarded any financial accounts they may have held in their own names. Otherwise, the court awarded neither party anything specific based on the long history of intermingling financial assets or attributable to any specific monetary claim.

The res judicata effect of a final order of divorce in cases where one spouse purports to have a conversion claim against the other is not fully clear. "To establish a claim for conversion, the owner of property must show only that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title." *P.F. Jurgs & Co. v. O'Brien*, 160 Vt. 294, 299 (1993). Wrongful

---

[2] In the footnote, the court refers to the checks as dated in August 2005 and written for $45,000. The actual checks are in the record. They were dated in August 1995 and the amounts are $47,500 ($95,000 total). The discrepancy between the footnote and the checks in the record is not explained. However, in context, the footnote appears to be incorrect and the checks referred to in this case and the footnote appear to be the same.

2

possession of property by another is the essence of the tort. Such a claim ordinarily is brought in the civil division. However, in a divorce, the parties' property generally is subject to equitable division, 15 V.S.A. § 751, by the family division, 4 V.S.A. § 33(a)(4), not the civil division, *id*. § 31(1). "All property owned by either or both of the parties [to the divorce], however and whenever acquired, shall be subject to the jurisdiction of the [family] court. Title to the property, whether in the names of either or, both parties, *or a nominee*, shall be immaterial." 15 V.S.A. § 751(a) (emphasis added). It is the family court's role in a divorce to determine the rightful possession of the parties' property.

In 1988, the Vermont Supreme Court adopted the following general reasoning of the New Hampshire Supreme Court:

> It is long-settled that a prior divorce decree acts as a bar to a subsequent action for divorce, as to the same ground and every issue actually litigated. However, no rule of preclusion is applicable to require that a prior divorce decree acts as a bar to a subsequent civil action in tort. . . .

> That a spouse can sue another spouse in tort cannot be questioned. Nor can it be argued that a civil action in tort is the same "cause of action" for res judicata purposes. Although we have emphasized that "a change in labels is not sufficient to remove the [preclusive] effect of [a] prior adjudication," we think it clear that a civil action in tort is fundamentally different from a divorce proceeding, and that the respective issues involved are entirely distinct.

*Aubert v. Aubert*, 529 A.2d 909, 911 (N.H. 1987) (citations omitted), cited in *Slansky v. Slansky*, 150 Vt. 438, 441 (1988). Applying this logic, the *Slansky* Court permitted an ex-husband to bring "conversion and breach of trust" claims that accrued before the final order of divorce claims against his ex-wife in a subsequent civil action.[3]

The Court shed more light on this area in *Cameron v. Rollo*:

> This Court has long recognized that the statutory grant of jurisdiction to the family division is exclusive and that there is no "overlapping jurisdiction— matters that belong in family court may not be brought in superior court." Section 31(1) of Title 4, recently enacted as part of the unification of the judiciary, excludes from the civil division cases that are subject to the jurisdiction of the family division. This allocation of jurisdiction is consistent with the statutory grant of exclusive jurisdiction to the family division to hear domestic cases including "[a]ll annulment and divorce proceedings."

---

[3] The Court affirmed the general holdings of *Aubert* and *Slansky* in *Tudhope v. Riehle*, 167 Vt. 174, 179 (1997) (reiterating that "a civil action in tort is fundamentally different from a divorce proceeding, and that the respective issues involved are entirely distinct" (citation omitted)). However, where the contemplated civil tort action is conversion between spouses regarding property subject or potentially subject to equitable division in divorce, it is not so clear that the issues are entirely distinct. While the ruling makes sense in *Slansky* due to the nature of the claim and potential damages at issue, it may make less sense when the conversion claim is dealing with an issue that the family division is fully capable of resolving.

Our appellate decisions have varied in the enforcement of the boundary between the family and civil division over property disputes. In *Tudhope v. Riehle*, we rejected an effort by an ex-spouse to bring a second lawsuit in the superior court (as the civil division was then known) on property issues after the family court entered a stipulated judgment order on these issues. In *Slansky v. Slansky*, however, we permitted a claim of conversion to proceed in the superior court after a divorce where one spouse improperly removed the other from the family health insurance coverage. The complexity of human relations will continue to produce cases which fall on both sides of the line. The boundary, however, is clear when the issue is whether marital property belongs to one spouse or the other. As this case demonstrates, confusion and uncertainty about whether a claim for the return of property following a divorce or annulment can be the subject of subsequent litigation in the civil division wastes the time of the parties and the courts. In holding that the family division has exclusive jurisdiction over the division of marital property in such cases, we seek to discourage exactly the type of collateral litigation filed in successive cases by this plaintiff.

*Cameron v. Rollo*, 2014 VT 40, ¶¶ 14–15, 196 Vt. 346.

On balance, the court concludes that the ruling of *Slansky*, which permitted a conversion claim between ex-spouses that accrued prior to the final order of divorce, does not similarly permit Mr. Noel's claims in this case against Ms. Owen. The conversion claim in *Slansky* arose because the husband paid the wife, prior to the divorce, to purchase a health insurance policy for him and their children. The wife purchased a policy as the insured and designated the husband merely an additional insured. When he was later removed from the policy, that designation caused him to lose coverage for a pre-existing condition. *Slansky*, 150 Vt. at 439. The husband was aware of this before the final order of divorce. He could have sought redress in the divorce proceeding, although presumably not the full assessment of damages to which he might be entitled in a civil action. Instead, the parties entered into a property settlement agreement that did not mention the health insurance policy. The wife evidently refused to discuss the matter. The family court incorporated the settlement agreement into the final order. The health insurance policy issue was never before the court. In those circumstances, the Court permitted the husband to proceed with his conversion claim for the first time in a civil action subsequent to the divorce. It did not permit him relitigate in a later civil action something that the family court had resolved.

This case is different for several reasons. Mr. Noel's conversion claim is unlike the one in *Slansky*. The property allegedly converted is a fixed sum. There is no apparent reason he could not have presented it to the family court and had it fully resolved in that proceeding, and he appears to have done precisely that. No civil action was necessary to fully redress the claim.

Mr. Noel and Ms. Owen's divorce also was contested. Each was represented by counsel, and they presented evidence. They did not settle and carefully omit from the settlement agreement the issues Mr. Noel is attempting to raise here. While Mr. Noel claims that the issue of the two checks was never litigated in the family division, that assertion is an exaggeration. It

4

is clear on the face of the final order that he presented evidence about the checks and about the "advances." Those issues were before the family division.

That the family division did not expressly make specific awards related to that evidence does not indicate that the matters were outside the scope of the final order and not considered by the court. The family division carefully made numerous findings related to the intermingling of personal and business finances, attempts at shielding assets from potential creditors, etc. Those findings must be understood to be integral to its later determination to enforce the nuptial agreements as to the remaining assets and debts of the parties at the time of divorce and to not make specific awards based on the long history intermingling funds. "The lines between who owned what were blurred." Final Order 9. Doing so left the intermingled funds wherever they came to rest. It did not invite subsequent civil actions to resolve precisely those issues.

Similarly, to the extent that Mr. Noel might have argued that the two checks at issue in this case were outside the scope of the divorce proceeding because they were the property of Euro-Dec, Inc., a third-party corporation that was not a party to the divorce, the court is not persuaded. First, he does not make that argument. Second, the family division's findings strongly suggest that it implicitly found that the parties did not observe corporate formalities during the marriage and the businesses were Mr. Noel's alter egos. "[W]hen the dark clouds of commercial litigation loomed, Husband readily transferred company shares into Wife's sole name. When it was to Husband's advantage, however, he was careful to maintain separate property." Final Order 10. The family division's findings also show that Mr. Noel presented evidence about the two checks in the divorce proceeding in an effort to undermine the nuptial agreements by showing a lack of separation of finances. Any argument here that Euro-Dec is entitled to separateness here is incongruous.

The issues Mr. Noel is attempting to raise here were presented to and resolved by the family division. This case is an impermissible collateral attack of the family division's final order of divorce.

ORDER

For the foregoing reasons, Defendant's motion to dismiss is granted.

Dated at Montpelier, Vermont this _____ day of April 2018.

_____
Mary Miles Teachout
Superior Judge

5